IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| THERESA DULTMEYER, | ) | CASE NO. 3:12CV2941 |
| | ) | |
| Plaintiff, | ) | JUDGE JACK ZOUHARY |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| CAROLYN W. COLVIN, | ) | |
| COMMISSIONER OF SOCIAL, | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Theresa Dultmeyer ("Plaintiff" or "Dultmeyer") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental social security income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the Commissioner's decision should be **AFFIRMED.**

## I.  Procedural History

Dultmeyer filed her applications for DIB and SSI on July 22, 2009, alleging a disability onset date of July 31, 2008.  Tr. 125-134.  She alleged disability based on affective and personality disorders.  Tr. 67-68.  After denials by the state agency initially and on reconsideration (Tr. 79-83), Dultmeyer requested a hearing.  Tr. 84-85.   A hearing was held before Administrative Law Judge  ("ALJ") Gabrielle Vitellio on March 28, 2011.  Tr. 32-66.

1

In her July 13, 2011, decision, the ALJ determined that Plaintiff's residual functional capacity ("RFC") did not prevent her from performing jobs that exist in significant numbers in the national economy, i.e., she was not disabled.  Tr. 15-27.  Dultmeyer requested review of the ALJ's decision by the Appeals Council. Tr. 11.  On September 28, 2012, the Appeals Council denied Dultmeyer's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A. Personal and Vocational Evidence

At the time of the hearing, Dultmeyer was a 49 year old female.  Tr. 20.   Dultmeyer is a high school graduate.  Tr. 148.  During the relevant period, Dultmeyer lived with her boyfriend.  Tr. 37.  Dultmeyer previously worked as an assembly worker from 1999 until she quit in 2008.  Tr. 38-39, 143.  Dultmeyer also worked for four months in a kitchen in 2009 but left that job because she passed out from the heat.  Tr. 40-41.

### B. Medical Evidence

#### 1. Treating Sources – Mental Impairments

In December 2007, prior to Dultmeyer's alleged disability onset date, she took several Celexa pills with eight beers and then drove herself to the emergency room.  Tr. 392, 397.  The evaluator diagnosed major depressive disorder and alcohol abuse, and referred her to Zepf Community Health Center ("Zepf").  Tr. 396-99.  Dultmeyer presented to Zepf in March of 2008.  Tr. 371.  Treatment notes from that time indicate that her mood was appropriate but that she was beginning to get stressed and depressed because she was out of work for four months and had no income.  Tr. 371.  The record contains no evidence of additional mental health

treatment until a year later.  In May 2009, Dultmeyer reported to Zepf nurse Peggy Gorman, R.N., that she had stopped taking her medication on her own because she thought it was making her depression worse.  Tr. 294.  Later that month, Dultmeyer states she was very depressed and had passive suicidal thoughts and increased agitation.  Tr. 247.  Ms. Gorman increased Dultmeyer's dosage of Celexa and started her on Klonopin.  Tr. 246.  At the end of the month, Dultmeyer reported she was feeling much better since starting Klonopin.  Tr. 244.

In June 2009, Plaintiff told Zepf psychiatrist Susan Haley, M.D., that she was feeling less depressed, less anxious, and sleeping better.  Tr. 240.  Later that month, Dultmeyer told nurse Cheryl Wortham that things were better and she was eating and sleeping well.  Tr. 239.  In July 2009, Dr. Haley stated that Dultmeyer "is doing reasonably well, but she is still fatigued, somewhat depressed, although less irritable and overwhelmed."  Tr. 284.  Dultmeyer requested to increase the Celexa because she stated that she felt better when the dosage was increased.  Tr. 284.  Dr. Haley agreed to increase the Celexa.  Tr. 284.

In September 2009, Dultmeyer rated her depression as a 4-5 on a scale of 1-10.  Tr. 276. Ms. Gorman encouraged Dultmeyer to increase her activity.  Tr. 276.  The next month, Plaintiff rated her depression as a 5 and stated that she does as little as possible.  Tr. 275.  Dr. Haley added Effexor and Cerefolin to Dultmeyer's medication regime.  Tr. 275.

In October 2009, Dr. Haley filled out a "Mental Status Questionnaire" on Dultmeyer's behalf and opined that she required constant reminders, had difficulty concentrating, did not complete household tasks, avoided social contact, was very constricted in her function and slow to adapt.  Tr. 304.  Dr. Haley further opined that Dultmeyer would not be able to maintain attendance and performance in a full-time job and that she would need "better remission of her symptoms as well as vocational rehab to be employable."  Tr. 304.

In October 2009, Ms. Wortham filled out a "Daily Activities Questionnaire," in which she opined that the following might prevent Dultmeyer from completing a normal work day: severe anxiety, paranoia, lack of energy, lack of initiative, severe depression, and frequent suicidal thoughts.  Tr. 306.

In December 2010, Dultmeyer reported that she was stressed due to her boyfriend's health problems and the holidays.  Tr. 409.  Later in the month, Dultmeyer reported that she was fine and did not want counseling.  Tr. 412.  In March 2011, Dultmeyer reported to Zepf indicating that she was still depressed but that her medications were working better.  Tr. 402, 404.  She was drinking 1-2 beers a week.  Tr. 404.

### 2.  Treating Sources - Physical Impairments

Plaintiff presented to the emergency room in April 2009 after fainting at work.  Tr. 206. She reported feeling dizzy and lightheaded when she fell to the ground.  Tr. 206.  X-rays showed advanced degenerative disc disease and neuroforaminal narrowing at C5-6.  Tr. 211.  An EKG revealed nonspecific abnormalities.  Tr. 206.  Dultmeyer was discharged with instructions to increase her fluid intake, eat regular meals, and follow up with her physician.  Tr. 207.

In February 2011, Plaintiff complained to Zeeshan Tariq, M.D., that she experienced chest pain, lightheadedness, neck pain, and had fallen down.  Tr. 489.  Dr. Tariq prescribed aspirin and advised she abstain from drinking alcohol and lose weight.  Tr. 493.  The next month, Dultmeyer consulted with Zubair Ashraf, M.D., for chest tightness, dizziness, and blurred vision. Tr. 483.  Dr. Ashraf referred Dultmeyer for a Tilt Table Test.[1]  Tr. 485.  Test reports indicate that chest tightness and heart rate increased during the test, but completely resolved once testing stopped.  Tr. 481.

---

[1] A Tilt Table Test is used to evaluate the cause of unexplained fainting.  During the test, the patient lies on a table that moves from a horizontal to a vertical position, and his/her heart rate and blood pressure are monitored.  Doc. 18, p. 8 (citing http://www.mayoclinic.com/health/tilt-table-test/MY01091).

### 3.   State Agency Opinions

In August 2009, psychologist Jennifer Swain, Psy.D., found Dultmeyer was not restricted in her activities of daily living, had mild difficulties in maintaining social functioning and in maintaining concentration, persistence, and pace, and had one or two episodes of decompensation.  Tr. 269.  Dr. Swain opined that Dultmeyer's overall functioning was not severely impaired due to psychological factors.  Tr. 271.  In October 2009, Steven J. Meyer, Ph.D., reviewed all the evidence of record and affirmed Dr. Swain's findings.  Tr. 372.

In December 2009, Michael Stock, M.D., noted that evidence dated in April 2009 showed a diagnosis of syncopal episode and dehydration but a CAT scan of the brain was normal and an examination was within normal limits.  Tr. 373.  Dr. Stock further remarked that Dultmeyer had not followed up or received any additional treatment or testing since April 2009.  Tr. 373.  Dr. Stock found Dultmeyer's physical impairments were not severe.   Tr. 373.

### C.  Functional Reports

Dultmeyer submitted a functional report dated August 11, 2009.  Tr. 159-166.  In the report, Dultmeyer stated that, on most days, she lies around, watches television, and sometimes runs errands.  Tr. 160-163.  She stated that she had no problems with her personal care, is able to prepare her own meals, complete housework with encouragement, drive a car, and shop for food. Tr. 161-163.   Dultmeyer stated she has problems with her memory, getting along with others, completing tasks, and concentration due to depression and anxiety.  Tr. 164.  Dultmeyer also stated she had problems with lifting due to a broken collarbone.  Tr. 164.

On October 27, 2009, Dultmeyer completed a second functional report.  Tr. 177-184. Dultmeyer's second report was similar to her first report with the following changes:  she stated she feeds her pets, only changes if she goes out, takes a shower and washes her hair once a week,

needs a pillbox to remember her medication, cooks only twice a week, and needs someone to accompany her during social activities.  Tr. 181.  She continued to state she had problems with memory, completing tasks, and concentration but did not state a problem with getting along with others.  Tr. 182.

### D.  Testimonial Evidence

#### 1.  Dultmeyer's Testimony

At the administrative hearing, Dultmeyer was represented by counsel and testified that she last worked as a plastics assembly worker.  Tr. 38-39, 62.  She stated that she quit the job because she got overheated and sick.  Tr. 38-39.  She stated she didn't have any trouble with coworkers or supervisors.  Tr. 40.  Dultmeyer also testified that she worked in a kitchen for four months in 2009 but left that job because she passed out from the heat and had to be sent to the hospital.  Tr. 40-41.  Dultmeyer stated that she thinks she would have been able to perform the work had it not been so hot in the work area.  Tr. 41.

Dultmeyer testified that she previously worked for Pro Pack Industries until 2007.  Tr. 42.  She stated she attempted to go back to ProPack after losing the kitchen job but was refused because she previously missed too many days of work due to her depression.  Tr. 42.  The ALJ asked if Dultmeyer was drinking alcohol during the time she worked for ProPack, Dultmeyer responded "Yes."  Tr. 43.  Dultmeyer stated that she never stopped drinking alcohol and still has "a beer here or there, which [her] doctor is not too happy about…but, [that she's] not drinking anything like [she] used to."  Tr. 43.

Dultmeyer testified that she is currently prevented from working due to her broken right collarbone, the fact that she can't work in any kind of heat, lightheadedness, and dizziness.  Tr.

43-49.  Dultmeyer also testified that she had a suicide attempt in 2009.  Tr. 50.  Dultmeyer stated

that currently she lacks energy and still feels depressed.  Tr. 51-52, 54.

### 2.  Vocational Expert's Testimony

Vocational Expert Tim Shaner[2] ("VE") testified at the hearing.  Tr. 61-66.  The ALJ

asked the VE whether a hypothetical younger individual with a high school education, who was

limited to performing simple, routine tasks and sedentary work, would be able to perform

Dultmeyer's past relevant work as a plastics assembly worker.  Tr. 62.  The VE responded,

"No."  Tr. 62.  The ALJ then asked whether there were any jobs in the national economy that

such a hypothetical individual could perform.  Tr. 62.  The VE testified that such an individual

could perform work as an assembler (41,000 jobs nationally, 2,100 jobs in Ohio), a packager

(69,000 jobs nationally, 3,600 jobs in Ohio), and an inspector (13,000 jobs nationally, 700 jobs

in Ohio).  Tr. 62-63.

The ALJ then changed the prior hypothetical by adding the limitation that the same

individual would also need at least one unscheduled break on a consistent basis.  Tr. 63.  The VE

testified that would significantly reduce and/or preclude employment.  Tr. 63.

Dultmeyer's attorney then asked the VE to assume that the prior hypothetical individual

would have to miss more than one to two days per month on a routine basis.  Tr. 63.  The VE

testified this would ordinarily result in discipline and termination.  Tr. 64.  Dultmeyer's attorney

then asked the VE whether it is fair to say that, typically in a work setting, an individual must be

able to focus and concentrate for periods of two hours at a time.  Tr. 65.  The VE responded:

> Nobody is on task 100 percent of the time from the time they go to work until the time
> they get off, except for breaks and lunch periods.  I mean, it would be a beautiful world I
> guess for employers if that was true, I mean, it really just isn't.  So, some jobs are going
> to require more constant focus than others.  Keeping up an assembly line, a conveyer belt

---

[2] The ALJ's decision lists Timothy Shaner.  Tr. 15.  The hearing transcript lists the VE as Tim Sheaner but clarifies
that is the phonetic spelling.  Tr. 61.

for example.  It doesn't make as many allowances as, perhaps, a cashier who (sic) customers slow down and they can just drift off for a while.  I mean, all jobs are different.

Tr. 65-66.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy…[3]

42 U.S.C. § 423(d)(2).

 In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ

---

[3] '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920[4]; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*


## IV. The ALJ's Decision

In her July 13, 2011, decision, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.  Tr. 17.

2.      The claimant has not engaged in substantial gainful activity since July 31, 2008, the alleged onset date.  Tr. 17.

3.      The claimant has the following severe impairments:  degenerative disc disease at C5-C6 with right sided neuroforaminal narrowing, abnormal EKG, and major depressive disorder.  Tr. 17.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.[5]  Tr. 18.

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[5] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration

5.      After careful consideration of the entire record, the undersigned finds that claimant has the residual functional capacity to perform sedentary work as defined in CFR 404.1567(a) and 416.967(a); specifically, the claimant can lift 10 pounds occasionally, stand and walk two hours in an eight-hour workday and sit six hours in an eight-hour workday.  In addition, the claimant can perform simple, routine tasks.  Tr. 21.

6.      The claimant is unable to perform past relevant work.  Tr. 25.

7.      The claimant was born [in 1961] and was 46 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date. Tr. 25.

8.      The claimant has at least a high school education and is able to communicate in English.  Tr. 25.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills.  Tr. 26.

10.     Considering claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 26.

11.     The Claimant has not been under a disability, as defined in the Social Security Act, from July 31, 2008, through the date of this decision.  Tr. 21.

The ALJ's decision became the final decision of the Acting Commissioner when the Appeals

Council denied Dultmeyer's request for review on September 28, 2012.  Tr. 1.

## V. Parties' Arguments

### A.      Plaintiff's Arguments

Dultmeyer argues that the Commissioner violated 20 CFR 404.1563(b) when the ALJ

mechanically applied the medical-vocational guidelines and did not consider whether Dultmeyer

---

considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

fit within the next age category.  Doc. 17, p. 12.  Dultmeyer also contends that the hypothetical and the RFC are flawed for the following reasons:  (1) the ALJ failed to include all documented nonexertional limitations; and (2) limiting Dultmeyer to simple, routine work did not address the specific mental limitations documented by the evidence.  Doc. 17, p. 18-20.

### B.    Defendant's Arguments

In response, the Commissioner argues that finding Dultmeyer was a "young person" for purposes of the decision was reasonable and her case did not present the necessary additional vocational adversities to mandate review of a higher age category.  Doc. 18, pp. 10, 12.  The Commissioner also asserts that the ALJ's RFC finding incorporates all of Dultmeyer's credibly established functional limitations.  Doc. 18, p. 14.


### VI. Law & Analysis

A reviewing court must affirm the Commissioner's decision absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Secretary of Health and Human Services,* 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A.  The ALJ followed the proper standard for evaluating borderline age

Dultmeyer argues that the ALJ erred by failing to consider her borderline age situation.

Doc. 17, p. 12.  Dultmeyer was 46 years old at the time of the alleged disability onset date and 49

years old at the time of the ALJ's decision.  Doc. 21.  The ALJ placed Dultmeyer in the "younger

person" age category, which includes people under age 50.  Tr. 25; 20 C.F.R. § 404.1563.  The

"younger person" category is followed by the "closely approaching advanced age" category,

which spans ages 50 to 54.  20 C.F.R. § 404.1632(c)-(d).  Dultmeyer argues that the ALJ should

have considered her to be age 50 and, therefore, an individual closely approaching advanced age

because, at the time of the ALJ decision, Dultmeyer was just over a month away from her 50th

birthday.[6]  Doc. 17, p. 12.   Dultmeyer argues that, if she was considered to be an individual

closely approaching advanced age, based on the ALJ's RFC finding, she would have been found

disabled per the Grids[7] as of age 50.  Doc. 17, pp. 13, 15.

Subsection (b) of the regulation governing age categories provides that there is some

flexibility between the age categories in "borderline" situations:

> How we apply the age categories.  When we make a finding about your ability to do other
> work under § 404.1520(f)(1), we will use the age categories in paragraphs (c) through (e)
> of this section. We will use each of the age categories that applies to you during the
> period for which we must determine if you are disabled. We will not apply the age
> categories mechanically in a borderline situation. If you are within a few days to a few
> months of reaching an older age category, and using the older age category would result

---

[6] Generally, courts hold that a person within six months of the next higher age category is considered "borderline." *See Pickard v. Commissioner of Soc. Sec.,* 224 F.Supp.2d 1161, 1168 (W.D.Tenn. 2002).  Borderline age consideration has been measured as of the date of the ALJ's decision for SSI purposes. *Crady v. Sec'y of Health & Human Servs.,* 835 F.2d 617, 620 (6th Cir. 1987). For SSD purpose, it has been measured from the claimant's date last insured. *See Van Der Maas v. Commissioner of Social Sec.,* 198 Fed.Appx. 521, 528 (6th Cir. 2006); *See also, Lewis v. Comm'r of Soc. Sec.,* 666 F. Supp. 2d 730, 736 (E.D. Mich. 2009).

[7] The Medical-Vocational Guidelines, known as the "Grid," are located at 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "Grid"). The Grid is composed of Rules 200.01-204.00. *Id.* The Grid includes rules that may be applied in cases where a person is not doing substantial gainful activity and is prevented by a severe medically determinable impairment from doing vocationally relevant past work. 20 C.F.R. § 404.1569. However, the rules contained in the Grid do not cover all possible variations of factors. *Id.*

in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

20 C.F.R. § 404.1563(b). In *Bowie v. Commissioner of Social Sec.,* 539 F.3d 395, 397–398 (6th Cir., 2008), the court found that a claimant presents a borderline age situation when: (1) the claimant's age is within a few days or months of a higher age category; and (2) use of the higher age category would result in a finding of disability. *Id.* Dultmeyer's age was just one month away from the higher age category at the time of the ALJ's decision. Dultmeyer contends that the RFC finding by the ALJ would indeed produce a finding of "disabled" per the Grids as of age 50. Doc. 17, p. 14. Dultmeyer did not cite to a particular Grid rule in support of her argument. However, for purposes of this R&R, it will be assumed[8] that a Grid rule in a higher age category would direct a finding of "disabled."

It is fair to assume from the ALJ's notation of Dultmeyer's age and birthdate that the ALJ realized that she was quickly approaching age 50. *Bowie,* 539 F.3d at 400. The ALJ specifically noted that, "clamant was 46 years old at her alleged onset date of disability, July 31, 2008. She was 49 years old at the time of the hearing." Tr. 21. The ALJ also cited 20 C.F.R. §§ 404.1563 and 416.963 which prohibit an ALJ from applying the age categories mechanically in a borderline situation. Tr. 25. The ALJ's decision demonstrates that the ALJ knew she had the discretion to "use the older age category after evaluating the overall impact of all the factors of [Dultmeyer's] case," but determined that it was not appropriate to do so. 20 C.F.R. §§ 404.1563, 416.963. Thus, the ALJ did not mechanically apply the Grids in this case.

---

[8] The ALJ used Grid Rule 201.21 as a framework for her decision and relied on VE testimony to determine that Dultmeyer was not disabled. Tr. 26-27. Grid Rule 201.21 dictates that, where a claimant who is classified as capable of sedentary work is a younger individual, has at least a high school education, and does not have transferable job skills, she is not disabled. However, the ALJ did not make a finding on the issue of transferability of job skills. Tr. 26. Assuming that Dultmeyer's job skills are not transferable and assuming she were determined to be "closely approaching advanced age," the Grid would likely dictate a finding of disability under Grid Rule 201.12. However, if Dultmeyer's job skills are transferable, the Grid would likely dictate a finding of "not disabled." 20 C.F.R. § 404, subpt. P, app. 2.

The ALJ did not explicitly address the possibility that Dultmeyer presented a borderline situation and did not discuss the possibility of moving Dultmeyer to the "closely approaching advanced age" category.  The Sixth Circuit has found that there is no *"per se* procedural requirement to address borderline age categorization in every borderline case.  Rather, the regulation merely promises claimants that the Administration will 'consider' veering from the chronological age default in borderline cases." *Bowie,* 539 F.3d at 399.

While not binding on this court, the procedural guidance set forth in the Agency's Hearings, Appeals, and Litigation Law Manual (HALLEX) provide that, even if a claimant is within a few days or months of reaching an older age category, "use of the higher age category is not automatic."  HALLEX § II-5-3-2, 2003 WL 25498826.  According to the HALLEX, in borderline-age situations, the ALJ decides which age category to apply using a "sliding scale approach." *Id*.  Under this approach,

> [T]he claimant must show progressively more additional vocational adversity(ies) — to support use of the higher age — as the time period between the claimant's actual age and his or her attainment of the next higher age category lengthens.
>
> One finds additional vocational adversity(ies) if some adjudicative factor(s) is relatively more adverse when considered in terms of that factor's stated criteria, or when there is an additional element(s) which has adverse vocational implications. Examples of these additional vocational adversities are the presence of an additional impairment(s) which infringes upon—without substantially narrowing—a claimant's remaining occupational base; or the claimant may be barely literate in English, have only a marginal ability to communicate in English, or have a history of work experience in an unskilled job(s) in one isolated industry or work setting. (An isolated industry would be such as fishing or forestry.) Other adverse circumstances in individual cases may justify using the higher age category.
>
> Absent a showing of additional adversity(ies) justifying use of the higher age category, the adjudicator will use the claimant's chronological age — even when the time period is only a few days. The adjudicator need not explain his or her use of the claimant's chronological age.

[These guidelines should be considered] whenever the age category changes within a few months after the alleged onset date, the date last insured (or the prescribed period), or the date of the ALJ's decision.

*Id.*

"**Additional Vocational Adversity" Requirement.**  In the current case, Dultmeyer argues that her significant psychological impairments met the additional vocational adversities requirement and thus required the ALJ to explain the use of her chronological age.  Doc. 17, p. 17.  Although an ALJ does not have a procedural obligation to address a claimant's borderline age situation in his opinion or explain his reasons for arriving at a particular age categorization, lack of an explanation may in some cases mean that the ALJ's ultimate decision is not supported by sufficient evidence. *Bowie*, 539 F.3d at 400-01.  In *Bowie*, the Sixth Circuit gave the following guidance:

> substantial evidence might be lacking where an ALJ, with no explanation, places a claimant in the 'younger individual' age category who is 49 years and 11 months, unskilled, sedentary, barely literate, and whose only previous work experience was in the fishing industry. *See* Rule 201.18, App. 2 to Subpart P of 20 C.F.R. § 404; HALLEX II–5–3–2. In that situation, the claimant's additional vocational adversities would be significant and would merit some discussion of proper age categorization in order to meet the substantial-evidence threshold.

*Id*.  Although there has been little development of the short list of examples provided in HALLEX, this Court finds that, under the particular facts of this case, it was procedurally acceptable for the ALJ not to specifically address in her opinion that Dultmeyer was a "borderline" age individual.

In *Bowie* the Sixth Circuit did not find evidence to support sufficient additional vocational adversities to require the ALJ to discuss the borderline age issue even though Bowie was limited to performing unskilled, sedentary work, and suffered from hypertension, aortic stenosis, and recurrent depression. *Bowie*, 539 F.3d at 396.  Similarly, Dultmeyer is limited to

performing unskilled, sedentary work, and suffers from depression, abnormal EKG, and degenerative disc disease.  Tr. 17, 21.  Accordingly, *Bowie* is analogous and Dultmeyer's case falls within *Bowie's* holding.  Moreover, the termination of benefits for Dultmeyer was not based directly on the grids. Instead, reference to the grids merely provided a framework for evaluating the medical and vocational evidence, including the testimony of a vocational expert.  *Ellison v. Comm'r of Soc. Sec.*, 101 F. App'x 994, 996 (6th Cir. 2004).

Furthermore, although the ALJ in *Bowie* did not find the claimant's limitations entirely credible, she was given the benefit of the doubt.  *Bowie*, 539 F.3d 395.  In this case, the ALJ found that Dultmeyer's claims as to her limitations were not fully credible.  Tr. 24.  The Sixth Circuit has found this distinction important in reviewing the additional vocational adversities issue.  *Caudill v. Comm'r of Soc. Sec.,* 424 F. App'x 510, 18 (6th Cir. 2011).  Accordingly, Dultmeyer has an even a weaker case for requiring a borderline age discussion than the plaintiff in Bowie.

In sum, the ALJ specifically acknowledged that Dultmeyer was 49 years old at the time of the decision.  The ALJ did not move her to the higher category, presumably because the ALJ did not find that Dultmeyer had demonstrated the "additional vocational adversities" required to do so.  *Van Der Maas v. Comm'r of Soc. Sec.,* 198 F. App'x 521, 528 (6th Cir. 2006).  The ALJ's failure to explicitly mention the sliding scale does not undermine the ALJ's determination to consider Dultmeyer's application according to her chronological age. A review of the ALJ's decision makes clear that the ALJ was unpersuaded by Dultmeyer's allegations regarding the extent of her impairments. Substantial evidence in the record supports the ALJ's conclusion. *Id.*; *Bowie*, 539 F.3d at 402; *cf. Turner v. Astrue*, 3:10-CV-186, 2011 WL 2783832 at *9 (S.D.Ohio July 11, 2011) (remanding the case for consideration of using the older age classification because

16

plaintiff showed the following additional vocational adversities:  limited to unskilled and sedentary work, depressive disorder causing moderate impairments in several functional areas, suffers from morbid obesity, pulmonary obstructive disease, and knee problems).  *Id.* at *9.

### B.  The RFC is supported by substantial evidence and properly incorporated all of Dultmeyer's credibly established limitations.

In Dultmeyer's remaining arguments she contends that the hypothetical and the RFC are flawed for the following reasons:  (1) the ALJ failed to include all of her nonexertional limitations; and (2) limiting Dultmeyer to simple, routine work did not address all of her mental limitations.  Doc. 17, p. 18-20.  Defendant argues that the ALJ properly incorporated all of Dultmeyer's credibly established functional limitations in the RFC.  Doc. 18, p. 14.

The regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ is to assess a claimant's RFC "based on all of the relevant medical and other evidence" of record.  20 C.F.R. §§ 404.1545(a); 404.1546(c); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ – not a physician – ultimately determines a Plaintiff's RFC"); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009) ("an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding").

Dultmeyer argues that the ALJ failed to take into account the following nonexertional limitations in the RFC:  no concentration for periods exceeding 15 minutes at a time, constant reminders, problems adapting to changes in the work setting, problems with attendance beyond 1-2 days a month, additional breaks required beyond the normal two fifteen minute and one half

hour break per day.  Doc. 17, p. 18.  In support of the need for these limitations, Dultmeyer cites

to treatment records from Zepf (Exhibit 6F, Tr. 302-325).[9]  Exhibit 6F, Tr. 302-325.

Although Dultmeyer was diagnosed with depression, a mere diagnosis is insufficient to

establish disabling functional limitations.  See 20 CFR §§ 404.1521, 416.921, *Higgs v. Bowen,*

*880 F.2d 860, 863 (6th Cir. 19*88) ("The mere diagnosis of arthritis, of course, says nothing

about the severity of the conditions.")  The ALJ found Dultmeyer's claims of having disabling

symptoms not fully credible because the medical records did not support her statements

concerning the intensity, persistence, and limiting effects of her symptoms and because she had a

tendency to provide inconsistent information.  Tr. 24.

With regard to the Zepf records, the ALJ stated:

> During the Zepf Center assessment, the claimant stated that she had been abusing alcohol
> since 2002, up to 15 beers each day, and that she had attempted suicide by overdosing on
> psychotropic medications in 2005 and November 2007. The claimant testified at the
> hearing that she had not attempted suicide since this episode. She said that she became
> overwhelmed after she quit her job and because of abusive behavior by her boyfriend.
> She also reported a compulsion to play "tear-off" tickets that she bought at a local bar that
> she frequented. She stated that she would spend her entire paycheck in a few hours  The
> claimant said that she resigned from a job in November 2007 due to stress, but she
> reported that her attendance was normal and her performance was good. Further, the
> claimant indicated that she wanted to work. The evaluator noted that the claimant could
> benefit from substance abuse treatment, but the claimant was non-committal. However,
> the claimant was cooperative, her grooming and hygiene were normal, her motor activity
> was normal, her conversation was reciprocal, her speech was normal, and her thought
> content was goal directed.  Susan Haley, M.D., diagnosed the claimant with a depressive
> disorder NOS, alcohol dependence, without physiological dependence, borderline
> personality disorder, and a GAF score of 50[10]. She was also referred to vocational

---

[9] Dultmeyer also argues that the ALJ should have provided additional functional limitations as follows:  no
hazardous machinery, no large groups, and no external pace setting requirements.  However, the records that
Dultmeyer relies on do not reference or contain any support for these functional limitations.  See Tr. 302-325.
Accordingly, these issues are waived.  It is not sufficient for a party to mention a possible argument in the most
skeletal way, leaving the court to . . . put flesh on its bones."  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir.
1997) (internal citations omitted); *Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 20*0*6); *see
also Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 537 n. 5 (7th Cir. 1992) (applying waiver rule
because judges need not devote time to "discussion of argument, raised if at all, 'in a very opaque manner.'").

[10] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a
hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical
Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric

services to obtain desired educational and job-related skills. The claimant told Dr. Haley that she was getting better and better and that her Celexa was helpful to her (Exhibit 2F, pp.3-5, 9, 10, 12, 15).

By the summer of 2009, the claimant reported that she was eating and sleeping well. Her mood was "pretty good" and her medication plan included Celexa, Klonopin, and Lunesta. She told her therapist that she was not using any illegal drugs or alcohol. Dr. Haley observed that the claimant presented neatly dressed and groomed, she made good eye contact, and she showed a greater range of affect. She no longer was labile, tearful, or overwhelmed. She added that the claimant showed no objective evidence of adverse effects from her medicines (Exhibit 2F, pp. 21, 24).

Treatment records from the Zepf Center show that the claimant continued to improve through 2009 and 2010 (Exhibit 5F, p. 10). In December 2010, her boyfriend became ill, which caused the claimant to fear his impending death. Not surprisingly, this situation moderately depressed her mood and blunted her affect. However, there was some smile at times, and she was more interactive than usual. She stated that she knew she could not drink alcohol at all, but she admitted having four beers when her boyfriend told her he was sick. She added that she was fine, did not want any counseling, and she would call when she needed help (Exhibit 14F, pp. 8, 11). The undersigned gives some weight to the treatment records from the Zepf Center because they are mostly consistent with the medical evidence, but also they are primarily based on the claimant's self-report of her symptoms.

Tr. 23-24. Regarding Dultmeyer's subjective complaints, the ALJ stated:

The undersigned held the record open for several weeks to allow the claimant an opportunity to furnish records from recent diagnostic tests. As noted, however, these records have not always substantiated the claimant's statements during the hearing or support her contention that she has a significant risk of falling. The claimant testified that she had not been hospitalized for mental health issues since 2007, although she indicated that her psychiatrist wished to readmit her in 2009. Even if this is true, the fact that the claimant refused to go because she believed that she was "all right," tends to indicate that she could be exaggerating her symptoms.

Furthermore, the claimant testified that she quit her most recent jobs, not due to an inability to do the work, or because her employer was unhappy with her performance, but because she could not tolerate the heat. She quit a factory job for that reason, and not because of a disabling medical condition, which coincided with the alleged onset date of disability in July 2008. After her alleged onset date, she worked briefly again in the kitchen job until she fell (as described above), but she specifically testified that she could have performed the kitchen work, as well, if not for the heat. The claimant stated that her

Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.*

broken collarbone, broken in 2003, prevented her from lifting overhead, but she testified to mowing the lawn, shoveling the snow, doing dishes, and cooking.

The claimant stated that she did not like to be around crowds or go out in public; however, she could drive short distances and she interacted frequently with family members. She testified and reported to evaluators at the Zepf Center, that she had no difficulty with coworkers or supervisors while employed, yet in response to her representative's question, she stated that she had problems being around others at work. She testified that she changed clothing and bathed infrequently, but mental health treatment records consistently described her grooming as appropriate, and the undersigned detected no unpleasant odors during the hearing. Finally, she testified that she could not follow the plots of stories on television, but she contradicted this assertion by explaining that she enjoyed reading short stories.

She acknowledged that she was drinking alcohol with her boyfriend in 2007 prior to her attempted suicide, and she testified that she continues to drink, but only "a beer or two," and not in the quantity that she once did. Although a mental health evaluator noted that the claimant could benefit from substance abuse treatment, the claimant has been non-committal. She said that she reduced her consumption of alcohol without the need of a rehabilitation program, but on her own with a few AA meetings. She said she could not work because she feared that she would fall down, but the diagnostic medical findings contradict this concern.

In sum, the above residual functional capacity assessment is supported by the treatment records from the Zepf Community Mental Health Center and the Rescue Mental Health Services, Dr. Ashraf's diagnostic tests and examination findings, and the claimant's testimony.

Tr. 24-25. The ALJ also gave great weight to the state agency psychological consultant opinion on October 27, 2009, which affirmed the agency's August 27, 2009, conclusion that claimant had only mild difficulties in social functioning, concentration, persistence, or pace, and no restriction in activities of a daily living and found that the medical evidence continued to support no substantive changes in claimant's medical condition.  Tr. 24, 269, 372.

After consideration of all of the evidence, the ALJ found that Dultmeyer has the residual functional capacity to perform sedentary work as defined in CFR 404.1567(a) and 416.967(a); specifically, the claimant can lift 10 pounds occasionally, stand and walk two hours in an eight-

hour workday and sit six hours in an eight-hour workday.  Tr. 21.  In addition, the claimant can perform simple, routine tasks.  Tr. 21.

Here, the ALJ accounted for limitations that are supported by the evidence.  In reliance on VE testimony in response to a hypothetical question that contained limitations that the ALJ found credible, the ALJ concluded that, based on that RFC, there was work that Dultmeyer could perform.  *See Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) ("[i]n order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence . . . [the] [h]ypothetical questions . . .  need only incorporate those limitations which the ALJ has accepted as credible") (internal citations and quotations omitted).

Dultmeyer argues that the limitation to simple, routine tasks gave little guidance to the VE and did not adequately describe the impact of her impairments in concentration, persistence, and pace.[11]  Doc. 17, p. 19.  The ALJ found that Dultmeyer was moderately limited in the category of "concentration, persistence or pace."  Tr. 20.  The phrase "concentration, persistence, or pace" is derived from the express language of the listings dealing with mental impairments. It is one of the four categories of criteria used to assess a claimant's functional limitations. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.00(C). When comparing a claimant's mental impairments with the listings at Step Three, an ALJ will usually determine whether a claimant has moderate, marked, or extreme limitations in the four categories. Notably, the criteria concerning limitations in "concentration, persistence, or pace" is written in the disjunctive. *Kline v. Astrue*, 1:12-CV-01802, 2013 WL 1947164 (N.D. Ohio Apr. 17, 2013) *report and*

---

[11] Dultmeyer also argues that the RFC limiting her to simple, routine work does not adequately account for her depression but the issue of Dultmeyer's depression as relates to the RFC was already discussed above, i.e., the ALJ did not find Dultmeyer's symptoms of depression were credible to the extent they prevented her from performing work.

*recommendation adopted sub nom. Kline v. Colvin*, 1:12 CV 1802, 2013 WL 1946201 (N.D. Ohio May 9, 2013).

Dultmeyer's argument is premised on the assumption that the ALJ found she was moderately limited in all three areas, including pace. This assumption, however, is without basis. "As a preliminary matter, it is significant to note that the ALJ did not necessarily attribute all three impairments—deficient concentration, persistence, and pace—to [claimant]. The classification is written in the disjunctive." *Id. (citing Brachtel v. Apfel,* 132 F.3d 417, 421 (8th Cir.19*97). In *Brachtel,* the Eighth Circuit explained that, even though an ALJ finds limitations in the category of concentration, persistence or pace, the ALJ is "not necessarily making a finding that the claimant has all three of these impairments." *Id.* A close reading of the decision reveals that the ALJ found Dultmeyer suffered moderate difficulties only in concentration.  The decision states as follows:

> With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant testified that she had difficulty concentrating and that she had a poor memory. She said that she could read short articles, but that she could not concentrate on television because she became bored easily.[12]

Tr. 20.  The ALJ's discussion addresses problems with concentration but not pace.  The RFC limits Dultmeyer to simple, routine work which adequately addresses the issues of concentration. *Kline*, 2013 WL 1947164 at *5.  There is no indication that the ALJ credited any evidence with respect to difficulties maintaining pace.  Reading the decision as a whole, the ALJ did not find that Dultmeyer had moderate pace-based limitations.  Because, as previously discussed, the ALJ

---

[12] The ALJ further stated, "State agency psychological consultants who completed a Psychiatric Review Technique (PRT) form found that the record disclosed that the claimant had moderate difficulties in maintaining social functioning." (Exhibits 3F; 8F).  This statement is confusing for two reasons.  First, the ALJ mixes up the category of social functioning with concentration, persistence, or pace (earlier in the opinion she found only mild limitations in social functioning).  Second, the state agency psychological consultants opined that Dultmeyer had only mild limitations in social functioning and concentration, persistence, or pace. Tr. 276, 329.  Accordingly, it appears from a full reading of the decision that the ALJ gave Dultmeyer the benefit of the doubt on her claims relating to difficulties in concentration for purposes of  Step Two.  Tr. 20.

is only required to incorporate in the RFC or hypothetical those limitations that he or she accepts as credible, the ALJ did not err by omitting pace-based restrictions.

Further, with regard to limitations based on concentration, Dultmeyer's attorney asked the VE whether a claimant doing simple, routine work would be required to focus in blocks of time of at least two hours.  Tr. 65.  The VE stated that nobody is on task 100 percent of the time and it really depends on the job.  Tr. 65.  The VE stated that some jobs require more constant focus than others.  Tr. 65.  Accordingly, the ALJ did not err by omitting a specific concentration timeframe limitation in the RFC.  The ALJ's RFC limiting Dultmeyer to simple, routine work is sufficient and supported by the evidence.

Dultmeyer has failed to demonstrate that the ALJ's RFC and ultimate disability determination are not supported by substantial evidence.  Thus, her request for reversal and remand based on the ALJ's RFC determination is without merit.

**Treating Physician Issue.**  At the conclusion of her brief, Dultmeyer notes that her "treating psychiatrist opined that [she] would not able to maintain attendance and performance in a full time job."  Doc. 17, p. 20.  Dultmeyer does not refer to the treating physician rule and thus she has waived a treating physician rule argument.[13]  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."

*McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (internal citations omitted); *Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 2006); *see also Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 537 n. 5 (7th Cir. 1992) (applying waiver rule because

---

[13] In Dultmeyer's reply brief, in response to an argument from the Commissioner, she also adds, "…there is complete failure to adequately address the treating mental health sources and giving good reasons for rejecting same."  Doc 19, p. 6.  Then Dultmeyer refers to Dr. Haley and Dr. Chahal.  *Id.*  Dr. Chahal is not discussed in this report because Dr. Chalal did not treat Dultmeyer after her alleged disability onset date of July 31, 2008.  See Plaintiff's Brief, Doc. 17, pp. 4-5 ("Plaintiff treated with Dr. Bhupinder Chahal, M.D. 2/26/06-8/30/07).

judges need not devote time to "discussion of argument, raised if at all, 'in a very opaque manner.'").

Alternatively, the ALJ's failure to mention the October 16, 2009, Mental Status Questionnaire, if it was error, was harmless error.  The ALJ is not required to adopt all limitations in a RFC but is required to give good reasons supported by evidence in the record for the weight assigned a treating source's opinion.  SSR 96–2p, 1996 WL 374188, *5 (July 2, 1996).  This "good reason" requirement serves both to ensure adequacy of review and to enable the claimant to understand the disposition of his case. *See Rogers v. Comm'r of Soc.,* 486 F.3d 234, 242 (6th Cir.2007).  Although the ALJ was not obligated to "discuss every piece of medical opinion evidence," the assessments made by a treating physician must be expressly evaluated to satisfy procedural requirements associated with the treating physician rule. *Karger v. Comm'r of Soc. Sec.,* 414 F. App'x 739, 753–55 (6th Cir.2011); *Friend v. Comm'r of Soc. Sec.,* 375 F. App'x 543, 551 (6th Cir. 2010) ("We will reverse and remand a denial of benefits, even though 'substantial evidence otherwise supports the decision of the Commissioner,' when the ALJ fails to give good reasons for discounting the opinion of the claimant's treating physician.").  In some circumstances, a violation of the good reasons rule might be "harmless error" if (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "where the Commissioner has met the goal of § 1527(d)(2)—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 547 (6th Cir. 2004).  In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" or "consistency" of a doctor's opinion is *indirectly* attacked via an ALJ's

analysis of that physician's other opinions, an analysis of the claimant's ailments, or an analysis of the record as a whole. *Nelson v. Comm'r of Soc. Sec.,* 195 Fed.Appx. 462, 470–72 (6th Cir.2006); *Hall v. Comm'r of Soc. Sec.,* 148 Fed.Appx. 456, 464 (6th Cir.2006).

Applying the harmless error analysis to this case, Dr. Haley's opinion was not patently deficient and the ALJ did not adopt her opinion with respect to the matters at issue.  The Commissioner argues that Dr. Haley's opinion is based upon Plaintiff's own subjective complaints and inconsistent with the record as a whole.  Doc. 18, p. 16.  A review of the ALJ's decision shows that the ALJ indirectly attacked Dr. Haley's opinions through her analysis of the Zepf treatment records, her analysis of other medical opinions, and her analysis of the claimant's ailments.

First, although the ALJ did not discuss Dr. Haley's 2009 opinion explicitly, the ALJ discussed and weighed the Zepf records, which included Dr. Haley's 2009 opinion.  In that discussion, the ALJ specifically mentioned Dr. Haley's treatment notes and gave some weight to the Zepf records as a whole.  However, the ALJ stated that these records were not given full weight because they were primarily based on Dultmeyer's self-reported symptoms.  It is clear that this analysis included Dr. Haley's treatment notes as these were discussed explicitly in the ALJ opinion.[14]  Tr. 23.   Accordingly, the ALJ indirectly attacked Dr. Haley's 2009 opinion because the opinion was based on the Zepf treatment records and the treatment records were sufficiently reviewed and clearly given less than full weight.

In addition, the ALJ indirectly attacked Dr. Haley's opinion by assigning greater weight to the state agency psychological consultants.  The state agency psychological consultants found

---

[14] The ALJ discussed Dultmeyer's 2007 referral to Dr. Haley, prior to the alleged disability onset date, in which Dr. Haley diagnosed her with depressive disorder NOS, alcohol dependence, borderline personality disorder.  The ALJ also discussed Dr. Haley's and other Zepf records from 2009 through 2010 which showed that Dultmeyer's symptoms improved and she was no longer overwhelmed (aside from December 2010 when she reported that she was moderately depressed when her boyfriend became ill).  Tr. 23.

that claimant had only mild difficulties in social functioning and concentration, persistence, or pace.  Tr. 20.   The ALJ gave great weight to the state agency psychological consultant who concluded that the medical evidence continues to support no substantive change in the claimant's mental condition.  Tr. 24.

Finally, the ALJ's analysis of Dultmeyer's mental health ailments also indirectly attacked Dr. Haley's analysis.  The ALJ found that Dultmeyer's claims regarding the intensity, persistence, and limiting effects of her mental health symptoms were not entirely reliable as discussed more fully above.  Tr. 24.

Based on the foregoing, although the ALJ did not explicitly discuss Dr. Haley's 2009 opinion, this failure was harmless error.   First, the ALJ adequately discussed and weighed Dr. Haley's treating notes, which were the foundation for her 2009 assessment.  Tr. 24.  The ALJ also clearly weighed the state agency consultant's opinion more heavily than any of the Zepf treating sources, including Dr. Haley.  Tr. 24.  Finally, the ALJ clearly noted in discussing claimant's mental impairments that Dultmeyer acknowledged that she could have continued performing kitchen work if not for the heat and that she had no difficulty with coworkers or supervisors while employed.  Tr. 24-25.  The ALJ also pointed out that claimant allegedly resigned from her job in 2007 due to stress, but reported that her attendance was normal and performance was good.  Tr. 23.  The ALJ found that Dultmeyer's claims were not reliable.  Therefore, the Zepf records, based primarily on her subjective complaints, were also not completely reliable according to the ALJ.  The ALJ's credibility determination is entitled to great deference. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir.2001) ("Subjective complaints of 'pain or other symptoms shall not alone be conclusive evidence of disability.' ") (quoting 42 U.S.C. § 423(d)(5)(A)). In evaluating the claimant's subjective complaints of pain an administrative law

26

judge may properly consider the claimant's credibility, and we accord great deference to that credibility determination. *See id.; Walters,* 127 F.3d at 531 (stating that an administrative law judge's "findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an [administrative law judge] is charged with the duty of observing a witness's demeanor and credibility."). *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004). Accordingly, all of the above shows that the ALJ discounted Dr. Haley's opinion[15] that Dultmeyer's mental health limitations would preclude employment.

## VII.  Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends that the Commissioner's decision be **AFFIRMED.**

Dated:  January 29, 2014

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[15]  In addition, to the extent Dr. Haley's 2009 Mental Status Questionnaire is merely a recitation of Dultmeyer's symptoms the opinion does not require adoption or discussion by the ALJ as it does not constitute a "medical opinion."  For example, Dr. Haley noted "concentration on television less than 15 minutes, does not complete household tasks, perceives thinking as slow."  Tr. 304.  *Kurish v. Comm'r of Soc. Sec.,* 2012 WL 6193890, at *9 (E.D.Mich. Nov.6, 2012) (a mere recitation of plaintiff's symptoms by a physician does not constitute a "medical opinion" because the statements do not reflect any judgment about the nature of plaintiff's impairments or articulate any limitations on his ability to function), *adopted by* 2012 WL 6192673 (E.D.Mich. Dec.12, 2012).